# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**LAMAR BURGESS,**

    **Plaintiff,**

**v.**                                                          Case No: 6:16-cv-2052-Orl-31DCI

**SCHOOL BOARD OF BREVARD COUNTY,**

    **Defendant.**

## ORDER

This matter comes before the Court without a hearing on the Motion for Summary Judgment (Doc. 25) filed by the Defendant, the School Board of Brevard County (henceforth, the "School Board"), the response in opposition (Doc. 31) filed by the Plaintiff, Lamar Burgess ("Burgess"), and the reply (Doc. 35) filed by the School Board.

### I. Background

This is an employment discrimination case. Burgess, who is African-American, worked for the School Board for 33 years. Originally hired in the position of Maintenance Worker, he subsequently held the positions of Pest-Control Technician and Maintenance Helper. He became an HVAC Mechanic around 2001 and, over time, was promoted from level I to level III in that position.

As described in detail below, beginning in 2012 there were a number of disagreements involving Burgess and two of his supervisors, who were white. In August 2013, Burgess was terminated. He was rehired a few weeks later, but his new job did not pay as well and required

him to travel further to get to work. He worked in the new position for three years, retiring in 2016.

Burgess filed the instant suit on November 23, 2016. In it, he asserts the following claims under Title VII: disparate treatment (Count I); hostile work environment (Count II); and retaliation (Count III). In counts IV through VI, Burgess asserts these same claims under the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01 *et seq.* ("FCRA").[1] By way of the instant motion, the School Board moves for summary judgment on all claims.

## II. Legal Standards

### A. Summary Judgment

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving

---

[1] Florida courts have held that decisions construing Title VII are applicable when considering claims under the FCRA. *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998). As such, this opinion will not separately consider Burgess's FCRA claims.

party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

### B. Title VII Disparate Treatment

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, prohibits discrimination on the basis of race, color, religion, sex, or national origin. It prohibits both intentional discrimination – known as "disparate treatment" – as well as some practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities – which is referred to as "disparate impact".

Disparate treatment presents "the most easily understood type of discrimination." *Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Disparate treatment cases occur where an employer has "treated [a] particular person less favorably than others because of" a protected trait. *Watson v. Fort Worth Bank & Trust*, 487 U.S.

977, 985–986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). A plaintiff in a disparate treatment case must establish that the defendant had "a discriminatory intent or motive" for taking a job-related action. *Id*. at 986, 108 S.Ct. 2777.

A plaintiff in a Title VII case may prove intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008). Where the employee attempts to prove discriminatory intent by way of circumstantial evidence, the claims are subject to the methods of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework, to establish a *prima facie* case of race-based disparate treatment, a plaintiff must show that: (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated employees outside the class more favorably; and (4) he was qualified to do his job. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). To be "similarly situated" to the plaintiff, another employee – referred to as a "comparator" – must be similarly situated in "all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). In cases involving discriminatory discipline, the court must ask "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (internal quotation marks omitted). The quantity and quality of the comparator's misconduct, moreover, must be "nearly identical" to that of the plaintiff "to prevent courts from second-guessing employers' reasonable decisions." *Id*.

If a *prima facie* case is established, the burden shifts to the employer to rebut the resulting presumption of discrimination by producing evidence that it acted for a legitimate non-

discriminatory reason. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The defendant need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff. *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1095-96.

If the four *McDonnell Douglas* elements are proven but the employer articulates a legitimate, nondiscriminatory reason for its actions, the plaintiff must then show that the employer's alleged reason is a pretext for illegal discrimination. *McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25. To prove such a pretext, the plaintiff must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks omitted). A legitimate, nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless the plaintiff shows that the reason is false and that the real reason is impermissible discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16, 113 S.Ct. 2742, 2751–52, 125 L.Ed.2d 407 (1993). Further, an employer's deviation from its company policy, standing alone, does not demonstrate discriminatory animus. *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–56 (11th Cir. 1999).

### C. Hostile Work Environment

To establish a hostile work environment claim, an employee must prove that the workplace "is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Where an employee bases his hostile work environment claim on race, he must prove: (1)

that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for the environment. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248-49 (11th Cir. 2014) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).

> The fourth element requires a plaintiff to prove that the work environment is both subjectively and objectively hostile. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir.1999). "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, ... [and] 'the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998)). The fifth element requires a plaintiff to prove that the employer is responsible for the hostile work environment because of actions taken by either a supervisor or a coworker. *Miller*, 277 F.3d at 1278.

*Adams*, 754 F.3d at 1249.

In evaluating the objective severity of the harassment, courts within this Circuit must consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Miller*, 277 F.3d at 1276 (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997)).

> Our precedents direct district "courts [to] examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Mendoza*, 195 F.3d at 1246. The totality of a plaintiff's workplace circumstances does not include other employees' experiences of which the plaintiff is unaware. Courts conduct the objective assessment from the perspective of a reasonable person in the

> plaintiff's position, knowing what the plaintiff knew. *Id.* A
> reasonable person in the plaintiff's position is not one who knows
> what the plaintiff learned only after her employment ended or what
> discovery later revealed.

*Adams*, 754 F.3d at 1250.

### D. Retaliation

Title VII prohibits an employer from "discriminating against any of its employees … because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). The *McDonnell Douglas* burden-shifting analysis applies in cases of retaliation relying on circumstantial evidence. *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate: (1) that he engaged in statutorily protected activity; (2) that he suffered adverse employment action; and (3) that the adverse employment action was causally related to the protected activity. *See, e.g.*, *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995).

> Once a plaintiff establishes a prima facie case of retaliation, the
> burden of production shifts to the defendant to rebut the
> presumption by articulating a legitimate, non-discriminatory reason
> for the adverse employment action. If the defendant carries this
> burden of production, the presumption raised by the prima facie case
> is rebutted and drops from the case. After the defendant makes this
> showing, the plaintiff has a full and fair opportunity to demonstrate
> that the defendant's proffered reason was merely a pretext to mask
> discriminatory actions.

*Bryant* at 1307–08 (internal citations and quotation marks omitted).

### III. Analysis

During the events at issue in this suit, Burgess's supervisor was Danny Stephenson ("Stephenson"), who was white, as was Stephenson's supervisor, Dennis Bonny ("Bonny"). Stephenson became Burgess's supervisor in 2006. Around the same time, Burgess became responsible for overseeing and distributing the numerous types of air conditioning filters used in

School Board buildings throughout the county. From 2006 to 2011, all of the evaluations Burgess received from Stephenson were favorable.

In December of 2011, Dennis Bonny ("Bonny") became the Director of Facilities and Maintenance for the School Board, making him Stephenson's supervisor. In 2012, Bonny began to raise concerns about problems with the air conditioning filters. According to Burgess, the problems resulted from a decision Bonny had made to change to a new supplier who, it turned out, could not provide some of the needed filters.

Bonny requested an inventory of the air conditioning filters used throughout the school district. He ordered Burgess to inspect every school and compile such an inventory within a week. Burgess told Bonny that the job could not be completed with that time frame, and he did not perform the inspections or compile the inventory.

In November 2012, Burgess attended a meeting with Bonny, Stephenson, and another School Board employee, Linda Conners, regarding the problems with the air conditioner filters. Burgess testified that Bonny threatened to fire everyone involved if they could not solve the problems. Burgess contends that he told Bonny he could not fire him, that he would instead return to his previous position, which involved inspecting and maintaining cooling towers throughout the district. Burgess was transferred back to the cooling tower position.

In the cooling tower position, Burgess was responsible for testing water chemistry, performing preventive maintenance, addressing malfunctions and breakdowns, and cleaning. When he first returned to the position, he was responsible for half the cooling towers in the district, and a white employee, Larry Elmore, was responsible for the other half. On May 2, 2013, Burgess was informed that going forward he would be responsible for all of the district's cooling towers, as Elmore was being given other duties. The School Board contends that Burgess

was told that the change was only temporary, and that his work load would not increase; Burgess denies being told that Elmore would resume responsibility for half of the towers, and disputes the School Board's assertion that his work load did not increase because of the change.[2]

The day after he was informed of the change, Burgess recorded on his "cost card" – his department's term for a time sheet – that he had travelled to three schools but had been "rained out" at each one and therefore was unable to perform any work during his eight-hour day. Stephenson and others contend that there was indoor work that could have been performed despite the rain; Burgess responds that he had been assigned to go to those three schools that day, and that all the indoor work at those schools had been performed a few days earlier.  (Burgess Declaration at 7-8).

Three days later, on May 6, Burgess's work truck would not start and had to be taken to the School Board repair shop.  His supervisors contend they were unable to locate him for several hours; Burgess contends he followed proper by procedure by staying with the truck until it was taken to the shop, then promptly taking a loaner truck to perform his duties.  Shortly thereafter, Stephenson directed Burgess to explain, in writing, the May 3 "rained out" cost card and the May 6 truck repair incident.  According to Stephenson, Burgess did not provide an adequate or timely explanation.  After a subsequent disciplinary hearing, Burgess was issued a warning and given a written reprimand.

Three months later, in August 2013, Stephenson notified Burgess that he could not find confirmation that Burgess went to the school locations identified on his cost card for July 24,

---

[2] In an affidavit (henceforth, "Burgess Declaration") accompanying his response to the instant motion, Burgess asserts that Stephenson scheduled him to treat and maintain "more cooling towers each day than Elmore was required to treat and maintain."  (Burgess Declaration, Doc. 31-1 at 6).

2013. Stephenson met with Burgess regarding the issue on August 2, 2103. At that meeting, Stephenson tried to give Burgess a written memo that directed him to provide a written explanation detailing his whereabouts on July 24, 2013. Burgess refused to accept or sign the memo on the grounds that it was not on School Board letterhead. Burgess then walked out of the meeting.[3]

The School Board's Director of Human Resources and Labor Relations, Joy Salamone, separately met with Stephenson and Burgess regarding the aborted August 2, 2013 meeting. Salamone determined that Burgess's refusal to sign the memo was unjustified and that his walking out of the meeting was "grossly insubordinate." As a result, she says, she made the decision to fire Burgess. The firing occurred on August 8, 2013.

Burgess filed a grievance with his union. On August 30, while the grievance was under review, Burgess was rehired by the School Board in a different position, as a custodian. The custodian position paid approximately $5 less per hour than Burgess's old position and required him to travel 20 miles further to get to work.[4] Salamone attests that Burgess was rehired as a kindness to a longtime employee and an accommodation to his union; Burgess suggests that it shows the School Board knew his termination had been improper.

For 12 months after his rehiring, Burgess was prevented from being able to transfer to a different job. He contends that white employees did not face similar transfer restrictions.

---

[3] Burgess never provided the requested explanation.

[4] There is apparently some question as to whether Burgess was fired and then rehired at a lesser position, or simply demoted. As the analysis is the same either way, the Court will not attempt to answer that question and will instead refer to Burgess as having been fired and then rehired.

Salamone responds that the restriction was a common element of job-related deals with the union, such as the one made with Burgess's union to rehire him, and had nothing to do with race.

Burgess contends that the problems he had with management beginning in 2012 – many but not all of which are recounted above – resulted from racial animus on the part of Stephenson and Bonny. As evidence of their racism, Burgess relies on the following:

1. Burgess states that Stephenson told him in January 2013 that he had "better watch out" because Bonny was "an active member of the Sons of the Confederacy." (Burgess Declaration, Doc. 31-1 at 2).

2. Stephenson listened to Rush Limbaugh and Glenn Beck at work every day at work from March 2012 through at least August 2013. (Burgess Declaration at 2).

3. Stephenson "ranted" to Burgess that black people were responsible for re-electing President Obama. (Burgess Declaration at 2).

4. While at work some time in 2012, Burgess was told by another School Board employee, Al Mylodina,[5] that Stephenson used the word "nigger" to refer to black people and the term "nigger lover" to refer to a white employee married to a black woman. Mylodina also told him that Stephenson had said that "fried chicken and watermelon" would be served at President Obama's 2013 inauguration dinner. (Burgess Declaration at 3).

5. While at work in November 2012, Mylodina told Burgess that Bonny had said that he was going to "get rid of all those niggers and nigger lovers [in the area Burgess worked] and put them all back in the field." (Burgess Declaration at 3).

6. At some point, Burgess observed that Bonny had a Confederate flag on the license plate holder for his

---

[5] According to Burgess, Mylodina was a supervisor during some but not all of the time he worked for the School Board. It is not clear from the record whether he was a supervisor when he (allegedly) recounted the racist remarks to Burgess. According to the School Board, Mylodina died before this suit was filed.

motorcycle, which he drove to work.   (Burgess Declaration at 5).

### A. Disparate Treatment

Burgess does not point to any direct evidence or statistical proof of intentional discrimination.   Therefore he must rely on circumstantial evidence.   To establish his *prima facie* case of disparate treatment, Burgess must show that (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) the School Board treated similarly situated employees outside the class more favorably, and (4) he was qualified to do his job.   *See*, *e.g.*, *Rioux*, 520 F.3d at 1274.   The School Board does not dispute that Burgess is a member of a protected class, that he was qualified to do his job, or that he was subjected to adverse employment action when he was terminated and then rehired at a less favorable position.

However, Burgess has produced no evidence that <u>similarly</u> <u>situated</u> employees outside of his class received more favorable treatment than he did, as required to establish a *prima facie* case. For example, he does not provide any evidence of a white employee who refused to accept a memo from a superior and walked out of a meeting, or otherwise acted in such an insubordinate manner, but was not terminated or similarly disciplined.[6]

---

[6] Burgess does repeatedly assert that, throughout his employment, white employees were treated more favorably than he was.   But he does not provide support for these assertions.   For example, as noted *supra*, he asserts that white employees were not subjected to transfer restrictions the way he was when he was rehired.   But Burgess does not identify any such employees to allow for a determination as to whether they were similarly situated.   He also contends that he was given a "(falsely) unfavorable evaluation" in January 2013 and complains that he was not placed on a "professional development plan as comparable white employees would have been placed." (Doc. 31 at 4).   But he does not identify any of these "comparable white employees" and he does not explain how he could have known what treatment those employees received after an unfavorable evaluation.   Similarly, he complains that in November 2012 the School Board, via Bonny, gave him two weeks to prove he had a high school diploma or its equivalent or face termination, and says that similarly situated white coworkers did not have to meet this requirement.   (It is undisputed that the official job description for the HVAC III position he then occupied included this requirement.)   Burgess does not identify any such coworkers or explain how he would know whether the School Board allowed them to continue working without

motorcycle, which he drove to work.   (Burgess Declaration at 5).

### A. Disparate Treatment

Burgess does not point to any direct evidence or statistical proof of intentional discrimination.   Therefore he must rely on circumstantial evidence.   To establish his *prima facie* case of disparate treatment, Burgess must show that (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) the School Board treated similarly situated employees outside the class more favorably, and (4) he was qualified to do his job.   *See*, *e.g.*, *Rioux*, 520 F.3d at 1274.   The School Board does not dispute that Burgess is a member of a protected class, that he was qualified to do his job, or that he was subjected to adverse employment action when he was terminated and then rehired at a less favorable position.

However, Burgess has produced no evidence that <u>similarly</u> <u>situated</u> employees outside of his class received more favorable treatment than he did, as required to establish a *prima facie* case. For example, he does not provide any evidence of a white employee who refused to accept a memo from a superior and walked out of a meeting, or otherwise acted in such an insubordinate manner, but was not terminated or similarly disciplined.[6]

---

[6] Burgess does repeatedly assert that, throughout his employment, white employees were treated more favorably than he was.   But he does not provide support for these assertions.   For example, as noted *supra*, he asserts that white employees were not subjected to transfer restrictions the way he was when he was rehired.   But Burgess does not identify any such employees to allow for a determination as to whether they were similarly situated.   He also contends that he was given a "(falsely) unfavorable evaluation" in January 2013 and complains that he was not placed on a "professional development plan as comparable white employees would have been placed." (Doc. 31 at 4).   But he does not identify any of these "comparable white employees" and he does not explain how he could have known what treatment those employees received after an unfavorable evaluation.   Similarly, he complains that in November 2012 the School Board, via Bonny, gave him two weeks to prove he had a high school diploma or its equivalent or face termination, and says that similarly situated white coworkers did not have to meet this requirement.   (It is undisputed that the official job description for the HVAC III position he then occupied included this requirement.)   Burgess does not identify any such coworkers or explain how he would know whether the School Board allowed them to continue working without

motorcycle, which he drove to work.   (Burgess Declaration at 5).

### A. Disparate Treatment

Burgess does not point to any direct evidence or statistical proof of intentional discrimination.   Therefore he must rely on circumstantial evidence.   To establish his *prima facie* case of disparate treatment, Burgess must show that (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) the School Board treated similarly situated employees outside the class more favorably, and (4) he was qualified to do his job.   *See*, *e.g.*, *Rioux*, 520 F.3d at 1274.   The School Board does not dispute that Burgess is a member of a protected class, that he was qualified to do his job, or that he was subjected to adverse employment action when he was terminated and then rehired at a less favorable position.

However, Burgess has produced no evidence that <u>similarly</u> <u>situated</u> employees outside of his class received more favorable treatment than he did, as required to establish a *prima facie* case. For example, he does not provide any evidence of a white employee who refused to accept a memo from a superior and walked out of a meeting, or otherwise acted in such an insubordinate manner, but was not terminated or similarly disciplined.[6]

---

[6] Burgess does repeatedly assert that, throughout his employment, white employees were treated more favorably than he was.   But he does not provide support for these assertions.   For example, as noted *supra*, he asserts that white employees were not subjected to transfer restrictions the way he was when he was rehired.   But Burgess does not identify any such employees to allow for a determination as to whether they were similarly situated.   He also contends that he was given a "(falsely) unfavorable evaluation" in January 2013 and complains that he was not placed on a "professional development plan as comparable white employees would have been placed." (Doc. 31 at 4).   But he does not identify any of these "comparable white employees" and he does not explain how he could have known what treatment those employees received after an unfavorable evaluation.   Similarly, he complains that in November 2012 the School Board, via Bonny, gave him two weeks to prove he had a high school diploma or its equivalent or face termination, and says that similarly situated white coworkers did not have to meet this requirement.   (It is undisputed that the official job description for the HVAC III position he then occupied included this requirement.)   Burgess does not identify any such coworkers or explain how he would know whether the School Board allowed them to continue working without

Burgess argues that his termination by Salamone is evidence of dishonesty and bad faith on the part of the School Board because, at the time of his termination, "Salamone no longer believed Mr. Burgess had not shown up at the schools, as averred by Stephenson." Burgess bases this argument on "Stephenson's tracking capabilities and his neglect in reviewing the sign-in cards." (Doc. 31 at 15). This argument fails in several respects. First, there is no evidence that Burgess was fired for (allegedly) not showing up at schools, or that Salamone changed her mind about whether Burgess had done so. According to Salamone's affidavit – which was attached to the motion for summary judgment – she fired Burgess for his "grossly insubordinate" actions of walking out of the August 2, 2013 meeting with Stephenson and refusing to sign or accept a memo from Stephenson. (Doc. 25 at 66-67). It is true that the memo from Stephenson that Burgess refused to sign or accept directed him to explain his whereabouts on the morning of July 24, 2013. (Doc. 25 at 66). But Salamone did not state that any (alleged) failure to show up at schools on that date prompted her to fire Burgess.[7] Burgess does not point to any other evidence tending to

---

fulfilling that requirement. (Moreover, the deadline for Burgess to prove that he met this requirement passed without him doing so, but the requirement was not enforced.) As a final example, he states in his affidavit that when Bonny complained about problems with the air conditioner filters, he recommended switching back to the original supplier, but Bonny declined to do so until a white employee made the same recommendation. (Burgess Declaration at 4). Even assuming that following one employee's recommendation rather than another's would constitute more favorable treatment of the first employee, Burgess does not identify the other employee who made the recommendation, or explain how he knew the recommendation had been made, or that Bonny acted on it, or anything of that nature.

[7] In addition, Burgess's only evidence of "tracking capabilities" is his statement, from his affidavit, that sometime prior to May 3, 2013, an unnamed "School Board Information Tech" who was working on Burgess's laptop told him "tracking software was installed on my computer and that it would 'ping' my location back to the maintenance office every time I entered or left the Wi-Fi zone at each school." (Burgess Declaration at 7). Burgess has not produced any admissible evidence that such software was installed. The School Board provided an affidavit from Robert Leach, who had provided IT support to the School Board for 17 years, denying knowledge of such software and denying tracking software is installed on employee laptops. (Doc. 35 at 11-12).

support the notion that his alleged failure to show up at schools on July 24, 2013 was the basis for his termination.

Burgess next points to a laundry list of his own statements, taken from the "Plaintiff's Statement of Disputed Facts" (or "PSODF") portion of his response[8] and, without further explanation, asserts that this somehow allows a jury to find in his favor:

> The actions and statements of Defendant's managerial personnel reek of dishonesty and bad faith. (PSODF, ¶ 8, 10, 23, 28-30, 32-37, 39-45, 47-49, 51-55.) Additionally, the evidence of the racism permeating the maintenance department, the consistency of the adverse actions with the stated racism such as Bonny wanting the niggers and nigger-lovers out of the office and into the field, and the lack of a legitimate reason for taking adverse action against Mr. Burgess allows a jury to find that racial animus motivated the adverse actions against Mr. Burgess. (PSODF, ¶ 8-12, 32,34-37, 39, 41-42, 45-55.)
>
> …
>
> Furthermore, evidence is adduced that creates a likelihood that Stephenson and Salamone are mendacious (PSODF, ¶ 8, 10, 23, 28-30, 32-37, 39-45, 47-49, 51-55.), which would allow a jury to disregard Defendant's proffered non-discriminatory reasons.

(Doc. 31 at 15).

As noted, Burgess does not attempt to explain how these statements support his larger points, and the Court is unable to find that they provide any such support. For instance, Paragraph 8 of the Plaintiff's Statement of Disputed Facts reads as follows:

> Every workday from approximately March, 2012, through at least August, 2013, Danny [Stephenson] played Rush Limbaugh and Glen Beck right-wing racist talk shows, at an extremely loud volume over a radio in the workplace, to which Mr. Burgess often was subjected and about which Mr. Burgess felt to be very hostile towards himself and other black people.

---

[8] The "PSODF" section of the response primarily consists of statements taken from his affidavit.

(Doc. 31 at 2). Burgess cites this paragraph as support for all three of these contentions – *i.e.*, that "[t]he actions of Defendant's managerial personnel reek of dishonesty and bad faith," that "racism permeat[ed] the maintenance department," and that "Stephenson and Salamone are mendacious," but the Court does not see any way that it supports any of them. The Court has reviewed the remaining cited statements and similarly does not find they support Burgess's larger points.[9] The motion will be granted as to this claim.

### B. Hostile Work Environment claim

To prevail on his hostile work environment claim, Burgess must prove five things: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for the environment under a theory of either vicarious or direct liability. The School Board does not contest the first element, but does contest the remainder.

Burgess argues that he has demonstrated that the School Board treated him with racial hostility, in that (1) he was "subjected" to right wing talk shows, but his white co-workers were not subjected to "analogous anti-white racism"; (2) Bonny "displayed" his motorcycle, with the Confederate flag license plate holder, to Burgess at the workplace; and (3) evidence shows Bonny was offended by black people and took steps to insure Burgess would not be in his presence. (Doc. 31 at 18). Burgess's support for these three points are, again, simply citations to paragraph

---

[9] Most troubling are the purported statements from Mylodina about racist remarks from Bonny and Stephenson. These out-of-court statements about out-of-court statements are of dubious admissibility. But even assuming Mylodina's statements fall within one of the hearsay exceptions, the undisputed fact is that Salamone, not Bonny or Stephenson, made the decision to fire Burgess for what she termed his gross insubordination.

- 15 -

numbers from the Plaintiff's Statement of Disputed Facts.  A review of the cited paragraphs shows that this argument greatly overstates the evidence.  Burgess testified that, once he resumed working on the cooling towers, he spent most of his time away from Stephenson's office (and his radio).  In addition, he has not recounted a single racist statement he overheard Limbaugh or Beck make while he was at work.[10]  There is no evidence that Bonny "displayed" the motorcycle to Burgess; Burgess's testimony is that he simply observed it in the parking lot.  And Burgess's "evidence" that Bonny took steps to keep him out of his presence is nothing more than speculation on his part.  Even accepting the underlying evidence as true, no reasonable jury could find that sometimes overhearing Rush Limbaugh, sometimes seeing a Confederate flag on a vehicle in the company parking lot, and believing that a supervisor did not want one working nearby could constitute harassment severe or pervasive enough to alter the terms and conditions of one's employment, or create an abusive working environment.

Burgess also complains about other instances where he felt he was mistreated, such as being required to check in with his superiors as to his location, even though he was no more "hard to locate" than his coworkers.  (Doc. 31 at 18-20).  Again, the requirement that Burgess "check in" with his superiors a few times a day, along with the other complaints he makes, are too minimal to constitute a hostile work environment.  The motion will also be granted to this claim.

---

[10] Attached to Burgess's response are two lists (Doc. 31-2, 31-3), compiled by others, of purportedly racist statements made by Limbaugh and Beck.  In his affidavit, Burgess states that the lists "contain statements that I have heard Rush Limbaugh and Glenn Beck, respectively, make."  (Burgess Declaration at 13).  Even assuming *arguendo* that the statements are indeed racist, the lists do not aid Burgess in establishing a hostile work environment claim.  For one thing, the lists contain several dozen statements, and Burgess does not specify which of them he heard, or when he heard them – i.e., while he was at work or at some other time.  Most importantly, none of the statements on either list are reported to have been made between March 2012 and August 2013, the time frame in which, according to Burgess, Stephenson was playing Limbaugh and Beck on his radio at work.

### C. Retaliation

In his third claim, Burgess contends that he was fired in retaliation for filing an EEOC complaint on February 14, 2013. (Doc. 31 at 19-20). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate: (1) that he engaged in statutorily protected activity; (2) that he suffered adverse employment action; and (3) that the adverse employment action was causally related to the protected activity. *See, e.g.*, *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995). The School Board contests only the third element of this claim.

Title VII retaliation claims require proof that the protected activity was a but-for cause of the employer's adverse action. *Univ. of Tex. SW Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013). The time period between an employee's protected activity and an employer's adverse action often "figures prominently" in the determination of whether the former caused the latter. *Booth v. Pasco Cnty., Fla.*, 757 F.3d 1198, 1207 (11th Cir. 2014). A short time-span between the two events is often all that an employee will be able to offer to support his contention that it was the protected activity that prompted the employer to visit some negative action on him. *Id.*

The United States Court of Appeals for the Eleventh Circuit has held that a one-month difference between an employer's knowledge of the protected activity and the adverse action can establish causation, but in the absence of other evidence, a three-month gap is insufficient to do so. *Clark v. South Broward Hosp. Dist.*, 601 Fed. Appx. 886, 897 (11th Cir. 2015) (citing cases). In this case, Burgess filed the EEOC complaint at issue in February 2013, six months prior to his firing in August 2013.

Recognizing that a six-month gap would not be enough to establish a but-for connection between his protected activity and his firing, Burgess argues that the Defendant "began in early May, 2013 to concoct reasons to fire him." (Doc. 31 at 20). However, the evidence Burgess attempts to rely on as to this point is paper-thin, consisting of

> the tracking software on Mr. Burgess's laptop; the extreme scrutiny to which he was subjected; the deviations from usual procedure; the solicitation from Mr. Burgess's lead and coworker for any damaging conversations; and, the neglect to review the sign-in cards.

(Doc. 31 at 20). There is no evidence, aside from the inadmissible hearsay statement of Burgess's unidentified "School Board Information Tech," that the School Board ever installed tracking software on his laptop. The remaining allegations are too vague (and undated) to support a finding that the School Board started trying to fire Burges in May 2013 but was unable to do so until August 2013. Even if the cited evidence could support such a finding, it would still mean that at least a three-month gap existed between the February EEOC complaint and the first efforts to fire Burgess, which is still too lengthy a time span to establish causation. The motion will also be granted as to Burgess's retaliation claim.

### IV. Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 25) filed by the Defendant, the School Board of Brevard County, is **GRANTED**. All pending motions are **DENIED AS MOOT**. The Clerk is directed to enter judgment in favor of the Defendant and close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on May 3, 2018.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE